Aron Steuer, J.
The findings are embraced in this opinion. For some three years prior to October, 1957 plaintiff was the owner of the premises located at 2905 East 177th Street. The premises were a two-story building. The ground floor consisted of a food store and a two-car garage. The upper story was an apartment. Plaintiff operated the store and lived in the apartment with her family.
In that month the property was condemned by the city for the Throggs Neck Expressway. At the same time, some land in the vicinity of Quincy Avenue had been transferred to the Triborough Bridge and Tunnel Authority to act as agent for the city to provide for the relocation of the occupants of the property condemned for the Expressway. Plaintiff, after conference with representatives of the Authority, selected a lot in the Quincy Avenue section. Her attorney thereupon notified the city, through the Board of Estimate. After some correspondence, the latter notified plaintiff that the minimum price for the lot was $7,500. Upon learning that this price was agreeable to plaintiff, the city had the Tunnel Authority withdraw the lot and notified plaintiff that the lot would be sold at public auction. *421 In August, 1958 the auction was held and plaintiff became the purchaser at $7,500, Her attorney was designated as the broker in the transaction and received a brokerage fee from the city. During these negotiations, plaintiff notified the Tunnel Authority that she would like to repurchase and remove her building to the new site and the Authority consented subject to the price of the building being fixed in a proper proceeding. Plaintiff discusssed moving her building with various project engineers who patronized her store and was advised that the building would not stand the strain of moving. This advice was informal, but plaintiff followed it and abandoned the idea of moving the building.
Thereafter through an architect, plaintiff filed plans for a two-family house on the lot. These plans were amended , and the new plans called for a store and apartment building substantially the same in character and general construction as the condemned building but materially larger as the new lot was larger than the old one. Admittedly, the Quincy Avenue area, including plaintiff’s location, is zoned for residence only. For this reason, plaintiff’s new plans were not approved. Plaintiff, nevertheless, went ahead with the construction. The city took appropriate measures by filing violations and, when these were disregarded, initiating criminal proceedings. No certificate of occupancy was issued. Plaintiff has made application before the Board of Standards and Appeals for a variance of the resolution to permit construction of the building and that application was still pending at the time of trial. This action is for a declaratory injunction declaring that the city’s acts in interfering with the conduct of plaintiff’s business and her occupancy of the premises are unlawful and for an injunction of said interference. Incidental damages are asked. A temporary injunction has been granted and under it plaintiff has completed the building and now occupies it and conducts her business in it.
The basis of plaintiff’s claim is found in subdivision 6 of section 384-15.0 of the New York City Administrative Code, reading: 11 Any building legally in existence prior to its relocation shall retain its legal status without any alteration which might be required pursuant to provisions of law relating to the new site. This subdivision shall apply to any building relocated to make way for a public improvement whether the relocation has been effected pursuant hereto or prior to the enactment of this section.”
The first question is whether plaintiff’s building comes within the purview of the section. The whole section from which the subdivision is quoted is described as emergency legislation to assist in overcoming a housing shortage. The first subdivision *422 reads: “ Where the board of -estimate has authorized the acquisition of lands from which dwellings must be removed before said lands may be improved, then the board of estimate may also authorize the acquisition of additional lands for the purpose of providing a site to which said dwellings may be relocated in order that they may continue to be used for housing purposes.” (Emphasis supplied.)
The second section authorizes the Board of Estimate to provide for relocation of the “aforementioned dwellings”. The third section authorizes the board to acquire deteriorated buildings for the purpose of relocating occupants of buildings taken for the site of the improvement. The fourth section dealing with the sale and rental after relocation refers to “buildings and dwellings ’ ’. The fifth section deals with property so used before passage of the act and refers to dwellings only. So it appears that except in the sixth subdivision, the only structures for which relocation is provided are dwellings and where the broader word “buildings” is used it refers to existing deteriorated buildings which are to be rehabilitated for the purpose of housing tenants. The sixth section cannot be so explained. In the first place, the application of the section would be difficult to imagine if the permission to override the zoning regulations were restricted to dwellings. Some areas are restricted to dwellings but none as far as is known restrict the type or kind of dwelling. On the other hand, the entire section deals with dwellings only. The only way in which the subdivision can be reconciled with the balance of the section is that it has application to the kind of building involved here, namely, one that •is both a dwelling and a building for other purposes. In accord with the familiar canon of statutory interpretation that all parts of a statute should be given meaning, if that is possible, the subdivision is so construed.
The next question is whether this is a relocation as that term is used in the statute. The statute forces the conclusion that it is not, and the only exemption intended to be granted is in the instance of a physical removal and relocation of the building involved. In subdivision four, provision is made for the preference between persons seeking lots in the relocation area. First choice is given to “ the original owner occupant of a relocated building”. Second choice is given “to an owner occupant on the site whose building it was impracticable to remove ’ ’. From this the conclusion is inescapable that a distinction is drawn between buildings physically removed from the old site to the new and buildings constructed on the new site in lieu of the old building. Only the former are referred to as being relocated.
*423 It might he argued that this gives the statute a capricious effect, in that the zoning restrictions are waived for one who moved his building but not for one who constructed a new building in the same shape as the old one. Though this is a matter for legislative rather than judicial concern, it is considered for what light may be thrown on the proper interpretation. Probably the great bulk of the instances where this subdivision would be called into effect deal with situations where the relocated building violated a provision as to construction, rather than one that affected the character of the neighborhood. There is no reason why a new building which could be conformed easily should not be made to do so, whereas this may be an onerous procedure in an existing structure. When this is considered it will be seen that the distinction in treatment accorded by the statute between relocated and replaced buildings is reasonable and sound.
Plaintiff makes a further contention that the city is estopped from taking any action based on the zoning regulations. Both in fact and in law the contention must fall. The record is barren of any representation that if plaintiff purchased the lot she would be allowed to conduct a store there. Nor is there anything in the transaction which implies such a representation. An estoppel cannot be spelled out from the facts.
Judgment is for the defendant and the injunction hitherto granted is vacated.